In the Matter of the Application of ADAM A. CROSS for a Writ of Certiorari to JAMES J. MARTIN and Others, as Police Commissioners of the City of New York, Constituting the Board of Police of the Police Department of the City of New York.

*Review of a conviction by the police commissioners of New York — judicial notice of acute memory — corroboration of immoral witnesses' evidence — cross-examination as to their reformation — conviction of an infamous crime — not sustained by evidence of neglect of duty.*

In determining the question as to whether a conviction by the police commissioners of the city of New York should be sustained or not, entirely correct and accurate rulings in regard to questions of evidence will not be required; the appellate court should determine from the record whether it discloses reasonable grounds for the conclusion arrived at, and one which has not been the result of the erroneous rulings in respect to the admission or exclusion of evidence.

Courts will take judicial notice of the fact that persons engaged in business, who cannot read and write, have their faculty of memory more acutely educated, for the reason that they are compelled to depend upon their memory and cannot rely upon written memoranda.

Much of the evidence upon which reliance must be placed, if crime is to be punished, comes from polluted sources. Crime is not ordinarily committed with respectable and reputable witnesses looking on who can testify to facts, but it has its birth largely in secret and amongst the disreputable, and the fact of its commission must be established, if at all, by proof taken from this class of the community. Such fact, while it necessitates a closer examination of the evidence and some corroboration of the witnesses, either from the nature of their testimony given or by the testimony of other witnesses, presents no reason for allowing crime to go unpunished.

If the story of a witness who is a disreputable person is of such a character and so consistent in its details and harmonizes so well with the surrounding circumstances as to carry conviction, even where there is no corroborating testimony, it may afford satisfactory proof of guilt, but where such evidence is not consistent, abounds in contradictions and shows a disregard of the truth, it cannot form the basis of a judgment establishing crime.

Where, upon the trial of a member of the police force, before the police commissioners of the city of New York, witnesses on the part of the prosecution testified voluntarily to their disgrace, the accused member of such police force has the right to test the truth of their claim of reformation, and if he is not permitted such right, in order that it may be said that he has suffered no harm because of the refusal to allow him such right, the evidence of his guilt must be of a very satisfactory character.

If, upon the review of the determination of the police commissioners of the city of New York, dismissing a member of the police force of such city, it seems to

First Department, March Term, 1895.　　　　[Vol. 85.

be probable that the charges for which the member of such force was dismissed related to the receiving of certain alleged bribes, and were not sustained by the evidence, the mere fact that a finding of neglect of duty on the part of such officer might be sustained upon the evidence will not prevent a reversal of the judgment of the police commissioners convicting the officer of an infamous crime. ·

CERTIORARI issued out of the Supreme Court and attested on the 6th day of September, 1894, directed to James J. Martin, John C. Sheehan, Charles H. Murray and Michael Kerwin, as police commissioners of the city of New York, constituting the board of police of the police department of the city of New York, commanding them to certify and return to the office of the clerk of the county of New York all and singular their acts, proceedings and documents in relation to the removal or dismissal of the relator from the police department of the city of New York.

*Elihu Root* and *Charles A. Hess*, for the relator.

*Francis L. Wellman*, for the respondent.

VAN BRUNT, P. J. :

On the 13th day of August, 1894, certain charges, forty-six in number, were presented to the respondents against the relator, who was then a captain of the police force of the city of New York. Notice of the preference of said charges and of the time and place where the same would be publicly examined were served upon the relator, and thereafter, on the 15th day of August, 1894, and subsequent days, a trial was had, and on the 31st day of August it was, by the said police commissioners, " Resolved, declared, ordered and adjudged that the said charges are true, and that the said Adam A. Cross be, and he is hereby, dismissed from the police force of the police department of the city of New York."

It appears upon an inspection of the record of the trial that upon charges 13 to 23 inclusive, and 25 to 35 inclusive, no evidence was offered, and it would seem that the police commissioners had dismissed such charges ; but, in their judgment, they find the same to be true, notwithstanding such dismissal. It might be a subject of interesting inquiry, perhaps, to know whether in the punishment of the relator the whole of the charges had not been considered instead of those only in respect to which proof had been offered.

The first twelve of the charges relate to the accepting of money for permitting to be kept open a disorderly house at No. 144 Chrystie street, kept by one Katie Schubert.

The thirteenth charge was founded upon alleged neglect of duty in permitting said house to be kept open.

The twenty-fourth charge was founded upon alleged neglect of duty in allowing a similar house to be kept open at No. 28 Bayard street.

The thirty-sixth charge was founded on an alleged neglect of duty in allowing a similar house to be kept open at No. 6 Delancey street.

The thirty-seventh to the forty-fourth charges were founded upon the alleged taking of money for permitting a similar house to be kept open at No. 24 Bayard street by one Rhoda Sanford.

The forty-fifth charge was founded upon alleged neglect of duty in permitting said house, No. 24 Bayard street, to be kept open.

And the forty-sixth charge was founded upon an allegation of a complaint having been made by one Hendrickson to the relator of money being taken by a patrolman of the police force named Kelly to influence him in the performance of his duty, and a failure and omission upon the part of the relator to report said dereliction of duty upon the part of said patrolman to the inspector of his district, and a failure or omission to take any steps or measures to investigate said dereliction of duty upon the part of the patrolman or to punish him therefor.

It appears from the evidence in the case that some time in April, 1892, the relator became a captain in command of the eleventh precinct in the city of New York, and remained in such command until some time in February, 1893, a period of about nine months; and it is claimed to have been established by the proof produced upon the trial of these charges that during said time he received as a bribe from said Katie Schubert the sum $500 and $50 a month for each of the months while he was in command of such precinct he, in consideration thereof, agreeing to permit said Katie Schubert to carry on her business of maintaining a house of prostitution.

It is also claimed to have been established by the evidence that some time in October, 1892, the said Rhoda Sanford paid the rela-

FIRST DEPARTMENT, MARCH TERM, 1895.            [Vol. 85.

tor $500 and $50 a month thereafter in order that she might be permitted to carry on her business, which was of a similar character, at the premises No. 24 Bayard street.

And it is also claimed that the evidence establishes the charge in respect to dereliction of duty in reference to permitting these houses to exist, and also in respect to the complaint which was made against the patrolman Kelly.

There is no evidence that the woman Sanford had anything to do with the relator Cross. According to her testimony, all her business relations in reference to protection from police interference was had with one Smith, who was the wardman in the precinct. The evidence connecting Smith with the relator is that of Katie Schubert, the keeper of the house of prostitution at No. 144 Chrystie street; and, consequently, if her evidence is of such a character that conviction cannot be predicated upon it, there is no evidence whatever against the relator in respect to the premises No. 24 Bayard street, except that of a general character in reference to the business being permitted to be carried on.

The witnesses to the bribery in reference to No. 144 Chrystie street were the proprietress of the establishment, claimed by the prosecution to be a very respectable married woman, and one Alice Ryder, another respectable married woman, who, for a period of eighteen months, was an inmate of the premises No. 144 Chrystie street and furnished part of the material with which business in that house was carried on. As has already been suggested, the claim was made before the police commissioners that whatever idiosyncrasies these ladies had indulged in for the period under consideration, they had since that time led creditable and respectable lives, both the ladies in question having married and *settled down*. When the counsel for the defense endeavored to get some information from these witnesses in regard to their present surroundings, their present location, their name and history, he was prevented from obtaining any information whatever upon this subject; and, hence, it was impossible for him to make any investigation in respect to the variety of these pretensions to virtue upon the part of these women who acknowledged that they had been engaged in this immoral business. Their evidence was placed before the tribunal in which the relator was being tried, as that of credible and respectable witnesses; the

board was asked to believe such evidence because they were creditable and respectable, and the relator was given no opportunity as already suggested to identify the witnesses so as to be able to ascertain to what extent these pretensions were true. It is perfectly clear that in a trial before a civil court no judgment could possibly stand which was founded upon evidence of witnesses in respect to whose identity such rulings had been made.

It is, however, to be considered that in proceedings before the board of police entirely strict and accurate rulings in regard to questions of evidence are not always to be expected, and in determining the question as to whether a conviction should be sustained or not, the record generally should be examined and the appellate court should determine upon such examination whether it discloses reasonable grounds for the conclusion arrived at and one which has not been the result of the erroneous rulings in respect to the admission or exclusion of evidence. Therefore, if upon an examination of this record, notwithstanding this extraordinary position in regard to the protection of witnesses from the ordinary investigation to which such witnesses are subjected in order that their credibility may be properly weighed, we should be satisfied that there was sufficient evidence to justify the conclusion at which the board arrived, we should not disturb the same.

When we come to examine the evidence of Katie Schubert, the principal witness for the prosecution, we are confronted with the fact that there is hardly a circumstance alleged to have surrounded the taking of this money in respect to which this witness Schubert has not given two diametrically opposite versions, or has not been contradicted pointedly by incontrovertible evidence.

It would be impossible within the limits of an ordinary opinion to go through the testimony of this witness and refer to the numberless contradictions which the record discloses therein. We will, therefore, advert to only a few of the more prominent examples, which will be sufficient, it seems to us, to show that the witness was utterly unreliable and unworthy of belief.

Upon her examination when first examined on the part of the prosecution the witness testified that she was a respectable married woman ; that she lived at one time on Chrystie street where she had lady boarders, and the house was kept as a house of prostitution ;

and that while she was in that business Captain Cross was one of the captains of the precinct, and was there for about six months, and that it was in the year 1892, she didn't remember whether it was the latter part or the first part, but it was after McLaughlin left and before Devery came; that she gave Captain Cross some money in the spring, and that Cross called on her with his wardman Smith.

The witness was then asked the question: " Q. How often did you see Captain Cross? " Her answer was: " He was only once at my house. Q. How often did you see him after that, at any place in the street or where? A. I have never seen him to speak to; I have often seen him pass in the street, but not to speak to." The witness then pointed out Captain Cross and was asked: " Q. This first time that you saw him, was it in your house? A. Yes, sir. Q. Smith was with him? A. Yes, sir. Q. Evening or daytime? A. Evening. Q. State the conversations that you had? A. He just came in, and officer Smith introduced him as our new captain and that I had to give up $500. * * * Q. Just state what was said? * * * A. There wasn't much of a conversation. Officer Smith just introduced the captain and told me: ' This is the captain and I will be his man, and you have got to give up $500, and then I will come every month after the fifty.' Q. Did he say if you did not do that what would take place? A. Then I didn't have the money and we set a date, and I do not know how many days after it was that I got the money, and Captain Cross called for it again, and as I handed him the money he gave me a very sarcastic laugh and asked me did I get small bills on purpose and couldn't I get it in big bills, that it make such a big roll. I said that I was glad enough to get that; I had to borrow it."

Thus within five minutes the witness contradicted herself in regard to her seeing the relator, swearing first that he was only once at her house, and immediately thereafter swearing to two interviews in her house.

In another part of her testimony the witness testified as follows: " Q. Then Captain Cross was in your place more than once? A. No; he was only there when he took the money. Q. Only there when he took the money? A. That is all. Q. Was that the occasion when this officer introduced him as you have testified? A. No; he intro-

duced him about a week before, because I didn't have the money at the same time as he introduced him. Q. Where did he introduce him? A. In my front parlor. Q. Then Captain Cross was in your place twice? A. Well, twice. Q. Once before when you paid him the money? A. Once when he was introduced, and next time he got the money. Q. What time of day was it? A. Half-past eight in the evening."

It is to be observed that she testified that this money was paid in the spring and that the captain had been in the precinct but a few days. She further testified that she paid Smith fifty dollars a month thereafter.

The witness was then asked: " Q. Did Captain Cross raid you at all? A. Yes, sir, once. Q. When? A. Once when he first came to the precinct. Q. Before you had given him any money? A. Yes, sir. Q. How long before? A. It was about three weeks. Q. About three weeks? A. About three weeks before I gave him the money. Q. And were you taken to the station house. A. Taken to the station house. Q. Was he then captain? A. Yes. Q. And what was done with you. Were you fined? A. Yes, sir. Q. How much? A. I was fined fifty dollars. Q. How soon after you paid your fine did you see the captain? A. I have seen him in a few days after. Q. A few days after you paid your fine, then the captain and Smith called. Is that it? A. Yes. Q. Did you have any talk with him about the raid at all? A. No, I didn't ask anything ; didn't have any talk about it."

There is no dispute about the fact that on the thirtieth of May, about five weeks after coming to the precinct, Captain Cross did raid the premises of the witness.

As an instance of the manner in which this witness testified it may be proper to call attention to the following bit of testimony : " Q. When did you first move to 144 Chrystie street? A. 1892. Q. What time in 1892? A. I moved there in July. Q. In July, 1892? A. Yes. Q. You moved to 144 Chrystie street. A. Well, I had moved there before that. Q. Answer my question. A. I had moved before. I had been in the house longer than that, but I didn't keep it in that style; didn't keep no ladies. Q. You moved to the house 144 Chrystie street in July, 1892. That is true isn't it? A. Yes, sir. Q. And from that time on you carried on business as

keeper of a house of prostitution? A. Yes. Q. Until when? A. Until six months ago. Q. Until six months ago? A. Yes. Q. That was about February, 1894? A. Yes. Q. Then, did you leave 144 Chrystie street? A. Yes, sir. Q. Where did you go to? A. Moved away. Q. Where to? A. I refuse to tell."

Subsequently, the witness swore that she lived at 144 Chrystie street in January, 1889, and lived there continuously until she left there about six months before, a period of four and a half or five years; that it was first kept as a gentlemen's boarding house and then was turned into a ladies' boarding house about two and a half years before the trial. But, although the witness was keeping a gentlemen's boarding house in 1889, according to her testimony, it appears that her place was raided by the Society for the Prevention of Cruelty to Children, and the witness indicted.

In another place in her testimony the witness says that this raid took place about two and a half years before her examination, when she first turned her house into a house of prostitution. Another instance of the unreliable character of the evidence of this witness is shown by her continual contradiction as to whether she paid this money to the captain before or after she was raided by him.

The witness having testified that the money was paid after she was raided and after her trial, the raid occurring on the 30th of May, 1892, and the trial on the twenty-first of June, she testified in one place that the money was paid in May, 1892, and in several other places that the payment was made before she was pulled.

And it would seem in connection with this matter that the witness was perfectly willing to swear either way upon this subject, because we find this testimony near the close of her examination:

"By the counsel for the prosecution: Q. Captain Cross, I understood you to say, raided you? A. Yes. Q. And then sent for you to come to him, and told you if you paid, it would be all right? A. Yes. Q. Now, how long after he had raided you, or pulled you, was it that he sent for you and told you if you paid your money it would be all right? A. I don't exactly remember, but it was after my trial was over. Q. Then, after your trial was over, it was that the captain sent for you and told you if you paid it would be all right? A. Yes. Q. How soon after he came into the precinct did he raid you? A. I think he was only there about two or three

weeks; 'I don't exactly remember, but that is as good as I can remember. Q. And two or three weeks after he raided you? A. Yes. Q. And after your trial, he sent for you and told you if you paid your money it would be all right? A. Yes. Q. And you fixed it up by payment, and it was all right? A. Yes."

"Re-cross-examination by counsel for the defendant: Q. Didn't you testify, in answer to my question, that you paid this $500 before Captain Cross raided you? Do you understand me? A. I understand you. Q. Please answer the question? A. I don't exactly remember if I gave him the $500 before or after I was raided; I think before I was raided. Q. Didn't you testify on the cross-examination, in answer to my question, that you paid Captain Cross $500 at your house before he raided you? A. And then I was raided; then he sent for me and told me to keep a little quiet until my trial was over, and when my trial was over, come to see him and he would fix me all right. Q. But you had paid Captain Cross the money before you were raided by him? A. Yes. Q. There is no mistake about that? A. No."

It seems to be thus apparent that, within a very few moments, the witness flatly contradicted herself in respect to the time of the payment of this money, and the circumstances attending the payment.

It was urged upon the part of the counsel for the prosecution that the witness might very well make a mistake in reference to the time at which this money was paid to the police captain, in that there were three captains there within thirteen or fourteen months; and she claimed to have paid $1,500 to those three captains — to McLaughlin, $500; to Cross, $500, and then to Devery $500; and in speaking of the payment of the $500 she might have referred to the $500 first paid to McLaughlin as paid before the raid.

But the difficulty with this explanation is that it hardly harmonizes with the testimony of the witness. It is true that she testified that she paid $500 to McLaughlin before Cross came. But she also testified, in equally positive language, that Cross was the first captain that she had dealings with.

The testimony of the witness in regard to the manner in which she got the $500, and her bank accounts is of an equally interesting character.

FIRST DEPARTMENT, MARCH TERM, 1895.　　　　[Vol. 85.

During the course of her cross-examination she was asked, referring to the time when she furnished the house in Chrystie street : " Q. Did you have any money in bank ?　A. No.　Q. Did you ever have any money in bank ?　A. Yes.　Q. What bank ?　A. Down town.　Q. Where down town ?　A. In Park row.　Q. There is Simpson's and two or three other places down there.　What bank have you reference to ?　A. I haven't got it now any more.　Q. You kept some money in a bank in Park row ?　A. Yes.　Q. How long did you keep the money there ?　A. Two or three months. * * * Q. Do you know the name of the bank ?　A. No, I don't, for I ain't got it no more, and I forgot the name of it, too.　Q. When did you draw out your last money ?　A. About two years ago.　Q. You don't remember the name of the bank ?　A. No.　Q. Do you remember how much you finally drew out ?　A. I don't remember that.　Q. Was it $500 or $1,000 ?　A. I don't remember.　Q. Was it $5,000 ?　A. No, sir ; never got as rich as all that.　Q. Haven't you any idea how much money you drew out of the bank ?　A. I don't remember exactly ; about $500 or $600.　Q. And that you drew out, you say, when ?　A. About two years ago.　Q. What did you do with the money ?　A. Spent it."

The witness further testified that she had borrowed the money which she paid to Captain Cross from Jacob Wolf and Isidore Kraushaar. Subsequently she was recalled, and was asked by the prosecution : " Did you have any bank account at all when you were keeping 144 Chrystie street ?　A. I did.　Q. Where was it ?　A. I had some money once in Canal street.　Q. At the Canal Street Bank ; now, other than that, did you have any bank account at all ?　A. No."

Upon examination by the counsel for the relator the witness was asked : " You don't remember having kept an account in 1892 ?　A. I kept it, but I don't exactly remember when it was.　Q. Was this the same bank that you testified to having kept an account in on my cross-examination ?　A. No, sir ; that is a bank I kept a bank account in ; a small bank account before I kept that house, and I did not think it was necessary for me to mention it.　Q. You did keep another bank account ?　A. I did.　Q. And it was a small bank account which you started before you kept that house ?　A. Yes, sir. Q. About how much ; what do call a small bank account ?　A. I don't know ; I don't remember.　Q. $250 ?　A. I don't know.

The witness was further asked: " Q. You did not have that account in 1892? A. I don't remember when I had it. Q. You don't remember when you had it? A. No. Q. And you don't know how much you had in 1892? A. No."

The witness was then asked: " Q. Did you keep an account in the Citizens' Bank? A. No. Q. Sure about that? A. I don't know anything about it. Q. Did you keep an account in the Citizens' Savings Bank in 1892? [Counsel for prosecution] ' On Canal street?' A. Not that I know of. Q. Did you keep an account at the Bowery Savings Bank in 1892, or at any time? * * * A. I did. Q. How much did you have there in 1892; do you remember? A. I don't know. Q. Was it more than $500? A. I don't remember. Q. Was it $5,000? A. No; I don't remember of having $5,000. Q. About how much was it? A. I could not tell you. Q. Did you draw any money out of the Bowery Savings Bank in 1892? A. I drawed it *just to pay back those people from whom I borrowed it.*"

The witness then further testified to having kept an account in the German Savings Bank as well as in the Citizens' Bank and the Canal Street Bank. But in this connection it may be proper to state that probably the witness confused the Bowery Savings Bank, the Citizens' Bank and the Canal Street Bank, because the name of the bank was the Citizens', and its location was at the corner of the Bowery and Canal street.

The witness was then asked: " Q. Don't you know that, in the three banks in which you kept an account in 1892, that there was to your credit over $5,000? A. No, sir; I did not exactly know. * * * Q. Or about $5,000? A. Maybe it was. Q. What did you mean by telling this board, on your cross-examination, that you did once keep a bank account in a bank on Park row, but that since you closed your account there you have kept no bank account anywhere; what did you mean by that? A. Because I have had that bank account pretty near all; it was when my husband was alive and he kept them, and I know nothing about it. They were left to me when my husband died, and I did not think it was necessary to mention them. Q. Were not these deposits with the banks I have mentioned kept in the name of Kate Wendt (the name of the witness' first husband being Wendt)? A. Certainly. Q. And didn't

you open those accounts in all the banks I have mentioned? A. No, sir; .I had them signed over to me after my husband died. Q. You are sure about that? A. Yes, sir. Q. And you cannot be mistaken about that? A. No, not at all. Q. Can you now tell us how much money you drew from any one of those three banks, or all three of those banks, in the year 1892? A. No, sir; I could not tell you; I don't remember. Q. Did you draw any money out of the Citizens' Savings Bank in the year 1892? A. No; I have drawed it every time I wanted money out of the Canal Street Bank. Q. Every time you wanted money you drew that from the Canal Street Bank? A. Yes, sir. Q. Can you tell us how much money you had on deposit to your credit in the Canal Street Bank at the time you say you gave $500 to Captain Cross? A. I have had $3,000. Q. You had $3,000? A. Yes, sir. Q. Then at the time you say you paid Captain Cross $500 you had to your credit in the Canal Street Bank $3,000? A. Yes, sir; I had it. Q. Now, having that large amount of money to your credit in the savings bank, why did you borrow $1,100 from Wolf and Kraushaar; why didn't you draw it from the bank? A. Because it was around the time that there was some trouble in the bank, and I could not get any money. Q. There was some trouble with the bank in 1892, and that is why you could not get any money? A. From what I can remember I went to get the money and could not. * * * Q. You never personally knew anything about trouble with that bank? A. I knew nothing; only I went there and there was a crowd of people, and they said I could not get in and get my money."

Subsequently the witness stated that she had handed over her bank book to somebody who went bail for her, and that he had the bank book and she could not draw the money; and she further testified that after she had been released and paid her fine and been discharged, she borrowed the money to pay Captain Cross.

The character of this evidence shows that the witness did not seem to think it necessary to testify to any fact which existed because she was questioned in respect thereto, and it is apparent that she had knowingly testified falsely in regard to the existence of this account in the Citizens' Bank. And it is also equally clear that she knowingly testified falsely as to the reason she gave for not

drawing the money from the bank. It appears that in 1890 there had been a run upon the Citizens' Bank, but, subsequent to that time, no trouble; and that instead of the witness going there she testifies in another place that she did not go, and could not get her money, because her bail had her bank book as security, and then further testifies that this money was borrowed and paid over weeks after she had been tried and discharged. It appears upon an examination of this bank account in the Citizens' Saving Bank that she had never drawn a dollar at the time she said she had drawn the money for the purpose of paying back the money which she had borrowed. It further appears from the testimony of the clerk of the bank that her testimony as to the account ever being in the name of her husband was absolutely false; that it was opened by her in March, 1887; that on the 1st of July, 1893, she had $3,210 to her credit, and that from the 10th of August, 1891, she had not drawn a dollar from that account.

It does not seem necessary to multiply instances of the absolute unreliability of this witness.

It was attempted to excuse her manifest prevarications and remarkable lapses of memory by the assertion that she could not read and write, and that, therefore, her mistakes in regard to her financial affairs and her bank account, and the times of the happening of these various transactions, arose from the fact that she had no means of refreshing her memory by any memorandum or writing which had been made.

It has been held by the Court of Appeals in the case of *Frace* v. *N. Y., L. E. & W. R. R. Co.* (143 N. Y. 182), which was an action to recover damages for the destruction of plaintiff's property by a fire alleged to have been kindled by sparks which escaped from an engine passing on defendant's road, that the court may take judicial notice of the fact that diamond stack and straight stack spark arresters are in very general use upon the railroads of the country, and that they are both well-known systems for arresting sparks, while no system that has yet been invented can wholly prevent the emission of live sparks from an engine under certain circumstances. And we think that we may equally take judicial notice of the fact that persons who are engaged in business, who cannot read and write, have their faculty of memory more acutely educated, for the

FIRST DEPARTMENT, MARCH TERM, 1895. [Vol. 85.

reason that they are compelled to depend upon their memory and cannot rely upon written memoranda. The fact that this woman could not read or write would, according to common experience, tend to create in her a more accurate and retentive memory, because it would be upon that faculty that she must rely in the conduct of her affairs. Instead, therefore, of her incapacity to read and write accounting for her loss of memory, it seems to make it the more remarkable. It is evident, upon a consideration of the whole of her testimony, that she was willfully forgetful and had not the slightest regard for the truthfulness of her testimony.

But it is claimed that the evidence of the witness Schubert was corroborated by that of the witness Alice Ryder, who, as we have seen, was also one of the virtuous inmates of this establishment. It was claimed that this woman had seen Captain Cross upon one of the visits which he is alleged to have made to this house, No. 144 Chrystie street.

The witness was asked: " Q. Did you ever see Captain Cross? A. I never saw him. I don't know that I saw him."

And then, after having testified to having been an inmate of that house for eighteen months, she testified to the counting out of $500 in bills for Mrs. Schubert, and giving them to her; and that on the same evening two gentlemen called, one of whom she described as being " dark complexioned, rather stout, very stout," tall and with a dark moustache. She stated that she did not get a good look at him, she just had a passing glance as she was going from the back parlor to the kitchen and as Mrs. Schubert was taking them into the front parlor. She also testified that she only saw this man that one evening and then didn't get a good look at him.

She was asked this question: " Q. Look around and see if you can pick him out. A. This is the one that seems to me (placing her hand on Captain Cross). * * * He looks very much like him. Of course I did not see him full face, but only side face."

The witness subsequently testified that she never saw this man before or after that night. It appeared that she had been arrested with the other girls in the house at the time of the raid by Captain Cross, and that he was at the desk and their names, etc., were taken down in his presence.

She further testified to having, at Mrs. Schubert's request, writ-

ten on certain envelopes the words "from Mrs. Schubert," which envelopes Mrs. Schubert testified she had put money in and left at the station house for the captain.

This was all the corroboration that there was of the testimony of Mrs. Schubert. It seems to us that it was wholly insufficient. It amounted to no corroboration at all, because upon the question of identity she must have testified falsely, as she saw the captain at the station house and was undoubtedly familiar with his presence. ·

It further appears, as has already been stated, that the relator was prevented from ascertaining as to whether this girl was still carrying on her business, or whether her statement that she was a respectable woman was true. In fact, all her testimony could be entirely correct (with the exception of the question of identification, on which the evidence does not seem to be very reliable) without its bearing at all upon the question of the guilt of the relator upon the charges preferred. An examination of this testimony necessarily leads to the conclusion that no man should be held guilty of the crime of bribery and forever disgraced upon such evidence.

It is undoubtedly true that much of the evidence upon which we must rely, if crime is to be punished, comes from polluted sources. Crime is not committed, ordinarily, with respectable and reputable witnesses looking on, who can testify to the facts; but it has its birth largely in secret and amongst the disreputable; and the proof of its commission must be established, if at all, by proof taken from this class of the community. These facts should be no reason for allowing crime to go unpunished. It necessitates, however, a closer examination of the evidence, and some corroboration of the witnesses, either from the nature of their testimony given or by the testimony of other witnesses.

If the story of such a witness is of such a character and so consistent in its details and harmonizes so well with surrounding circumstances as to carry conviction even where there is no corroborating testimony, it may afford satisfactory proof of guilt. But where such evidence is not consistent, abounds in contradictions and shows a disregard of the truth, clearly it cannot form the basis of a judgment establishing crime.

The evidence of Mrs. Schubert and Alice Ryder, as we have seen, shows certainly considerable recklessness of assertion and lapses of

FIRST DEPARTMENT, MARCH TERM, 1895.          [Vol. 85.

memory which cannot have had an honest origin. As has been already stated, the claim was and is made by the prosecution that these women were respectable women, and that the weight due to good repute should be given to their testimony; but the relator was refused the right to test by the methods well recognized in the law these claims upon the part of the prosecution. The identity and location of these witnesses was studiously concealed, and the relator was refused the right to examine them as to their present whereabouts and occupation. It may well be, had the ordinary opportunity of cross-examination been offered, that the relator might have been able to have shown by their neighbors that this claim of respectability was all a sham and delusion.

The attempt to justify this ruling upon the plea that it was to protect these witnesses from exposure as to their past life, they having reformed, cannot prevail, because having testified voluntarily to their disgrace (we say voluntarily because they could have shielded themselves under their privileged claims to have reformed) the relator had the right to test the truth of the claim of reformation. Under such circumstances, in order that it may be said that the relator has suffered no harm because of this ruling, the evidence of guilt should be of a very satisfactory character, instead of being of the unreliable character exhibited in the case at bar. The same ruling was made in the case of Rhoda Sanford, who did not claim that she had reformed, and the relator was even in her case deprived of the benefit of showing her surroundings, and the influence under which she was testifying.

As has already been suggested, the charge, so far as the taking of money from Rhoda Sanford is concerned, depends upon the testimony of Mrs. Schubert connecting the captain with the wardman Smith. Mrs. Sanford swears that she never paid any money to the captain; that all her transactions were with the wardman. It appearing that the woman Schubert is entirely unworthy of belief, there is nothing to connect the relator with the charge of bribery in regard to the house of Mrs. Sanford, No. 24 Bayard street.

As to the charge of failing to report these disorderly houses, there was a conflict of testimony and different conclusions perhaps might be drawn therefrom. But as it seems to be probable that the charges for which the relator was dismissed were as to the receiving

of these alleged bribes, the mere fact that a finding of neglect of duty might be sustained upon the evidence should not prevent a reversal of the judgment of the police commissioners convicting the relator of an infamous crime.

It is claimed upon the part of the relator that the reason the charge against Kelly was not pressed, was because he had been retired from the police force a few days before the complaint of Hendrickson. It may be a question as to whether this was a sufficient excuse for entire neglect to investigate the matter; but, as already suggested, it does not appear that the sentence was pronounced because of a conviction upon this charge.

Upon the whole case, therefore, we think that the judgment of the police commissioners should be reversed and the relator reinstated, with costs.

O'Brien and Parker, JJ., concurred.

Judgment of commissioners reversed and relator reinstated, with costs.