The People of the State of New York ex rel. Joseph B. Eakins, Relator, v. Theodore Roosevelt and Others, as Police Commissioners of the City of New York, Constituting the Board of Police of the Police Department of the City of New York, Respondents.

*Police department of New York city — failure of a police captain to take out a superintendent's warrant to search suspected disorderly premises — evidence of raids upon disorderly houses — when the general reputation of such houses may be proved — strict rulings as to evidence not required — a prostitute not required to give her true name.*

Where it is made, by statute, the duty of a police captain to carefully observe and inspect all houses of ill-fame or prostitution and houses where common prostitutes resort or reside, the police commissioners, upon a trial of the captain, upon charges of neglect of duty, may consider, with other circumstances, the fact that, although the law permitted the captain to apply for a superintendent's warrant to search premises suspected of being disorderly, yet he never applied for such a warrant.

Where twenty-six disorderly houses exist in a precinct, the police commissioners may, upon the question as to a neglect of duty by a police captain, consider the fact that although fifty-seven similar houses were raided in the precinct in a prior period of about a year, yet in a subsequent period of four and one-half months, covered by the charges made against the police captain, only two such houses were raided.

In proceedings before the board of police commissioners of the city of New York entirely strict and accurate rulings in regard to evidence are not always to be expected, and will not be considered essential to the affirmance of its decision on a review thereof by certiorari.

*Semble,* that it is not error to permit a prostitute, who desires to shield her relatives, to withhold her real name.

Where houses have been proved to be of a disorderly character the testimony of other witnesses, as to the general reputation of the houses, is competent upon the question whether a police captain, by reasonable diligence, ought to have acquired knowledge as to their character and reputation.

Certiorari issued out of the Supreme Court and attested on the 11th day of December, 1895, directed to Theodore Roosevelt and others, as police commissioners of the city of New York, constituting the board of police of the police department of the city of New York, commanding them to certify and return to the office of the clerk of the county of New York all and singular their proceed-

ings relating to the removal and dismissal of the relator as a police captain of the city of New York.

*Edwin S. Hunt* and *Charles A. Hess,* for the relator.

*Theodore Connoly, Edwin J. Freedman* and *Francis M. Scott, Corporation Counsel,* for the respondents.

PARKER, J. :

This is a proceeding upon a writ of certiorari sued out by the relator to review his dismissal from the police force of the city of New York in which he was captain.

On the 13th day of May, 1895, there were served upon Captain Eakins, Superintendent Byrnes and President Roosevelt, of the board of police, certain papers drawn up by the Society for the Prevention of Crime, which contained, in substance, the charges upon which the relator was finally tried. These charges were substantially of neglect of duty in permitting the flourishing of a number of houses of ill-fame, and of assignation and of disorderly houses in general in the fifteenth precinct.

Thereafter, the facts alleged in the papers presented by the Society for the Prevention of Crime were embodied in formal charges and presented to the police board. These formal charges contained seven specifications, the first of which was founded upon an alleged violation by the relator of the rules of the department and of sections 280 and 282 of the Consolidation Act (Laws of 1882, chap. 410), in that he did not report certain disorderly houses, situated in his precinct, to the superintendent of police, and did not earnestly and zealously proceed to repress and restrain the unlawful and disorderly conduct and practices therein.

The location and character of the places referred to in the specifications were set out. Under the title "Saloons and Resorts of Prostitutes," six places were named; under that of "Houses of Prostitution," four; "Houses of Assignation," fifteen, and "Additional Disorderly Houses," two, making twenty-seven in all. The second specification was founded upon alleged neglect of duty in failing to inspect certain places named, each of which had an excise license, and to arrest all persons there violating the law. The third specifi-

cation was founded upon alleged neglect of duty in permitting a renewal of the excise license by the board of excise, without objection by the relator and without notification by him to the board, of the character of certain houses described. The fourth specification contains a charge of substantially the same character as the third. The fifth specification is founded on an alleged neglect of duty, in that the relator recommended the granting of a license to one Wallace who kept a place of bad reputation. The sixth specification was founded upon an alleged neglect of duty in permitting prostitutes and disorderly persons habitually to assemble and carouse in specified saloons and to solicit men therein, and to otherwise conduct themselves in a disorderly manner.

The seventh specification was founded on alleged neglect of duty in failing to take action to enforce the laws and ordinances against the occupants of certain houses specified, after being specially notified by citizens of the evil conduct of such houses.

Such portions of the statutes, and of the rules and special orders of the board as are particularly relevant to the charges against Captain Eakins, are as follows :

" Section 282. It is hereby made the duty of the police force at all times of day and night, and the members of such force are hereby thereunto empowered to especially preserve the public peace, prevent crime, detect and arrest offenders, * * * carefully observe and inspect * * * all houses of ill-fame or prostitution, and houses where common prostitutes resort or reside, * * * and to repress and restrain all unlawful or disorderly conduct or practices therein, enforce and prevent the violation of all laws and ordinances in force in said city," etc.

" Rule 193. Any member of the police force may be punished by the board of police in their discretion, either by reprimand, forfeiture and withholding pay, not exceeding thirty days, for any one offense, or by dismissal from the force on conviction of either of the following offenses, to wit: * * * neglect of duty, of violation of the rules, of neglect or disobedience of orders, of any legal offense, * * * of conduct unbecoming an officer, of conduct injurious to the public peace or welfare."

Rule 414 provided that

" Members of the force will particularly notice the follow-

ing section of chapter 410, Laws of 1882." (And here follows in full section 282 of the Consolidation Act, of which a portion has already been given.)

Rule 64 is as follows :

"Rule 64. Captains shall report quarterly to the superintendent the location of all houses of prostitution, assignation, bed houses and suspicious places in their respective precincts, and the names of the keepers and owners thereof, also all places used for gambling, lottery or policy purposes."

And rule 66 provided that "captains will be held strictly responsible for the preservation of the public peace in their respective precincts, and to insure good order they are vested with the power to post the men under their command in such precincts, and to assign them such duties as they may deem expedient under the supervision of the superintendent and inspector of the district, and in accordance with the rules and regulations of the board."

"SPECIAL ORDER 676.

" To Commanding Officers of Precincts :

"You will report to this office at 10 o'clock A. M. on Thursday of each week the general condition of your precinct as to the proper enforcement of all laws and ordinances and especially relative to concert saloons and the Excise Law ; also what action you have taken toward the suppression of gambling houses, policy shops, houses of prostitution and assignation, places known as dives, and disreputable places of all kinds within your precinct. This report to be sent direct to the superintendent's office.

" Special order No. 660 is hereby rescinded.

" THOMAS BYRNES,

" Supt. of Police."

The first specification charged a failure to make a report to the superintendent of police such as is required by special order 676. Under date of January 1, 1895, the relator reported to the superintendent as follows :

" SIR.— In compliance with rule 64 I respectfully report : There are no houses of prostitution, assignation or bed houses, gambling houses, lottery or policy offices, suspicious persons, or places in this precinct."

Under date of April 1, 1895, he made a report to the superintendent in the same language.

On January 3, 1895, he made a report in compliance with special orders 676 and 704, in which he stated, among other things: *Fourth.* " Relative to the action taken toward the suppression of gambling houses, policy shops, houses of prostitution or assignation. There are no gambling houses, policy shops, houses of prostitution or assignation in this precinct."

That these reports were untrue was established on the trial. Of the twenty-seven places referred to in specification 1, twenty-six of them were covered by the evidence for the prosecution, and, in several instances, notably the St. Lawrence, Jerome and Daley's, the evidence was positive and uncontradicted that they were either houses of prostitution or assignation. That the captain had such information as to the character of some of the houses as induced him to suspect that they were disorderly houses is shown by his testmony on cross-examination.

The places described in specification 1 were shown to him, and he named fifteen of the houses as being under suspicion. To the question, " Did you suspect them of being houses of assignation ? " he answered : " They were disorderly houses." It is established, therefore, that the assertion in the captain's reports that there were no houses of prostitution, assignation or disorderly houses in his precinct was not true as matter of fact, and that the captain had reason to believe it was not true. The excuse presented for the making of such reports was that prior to the time covered by the specifications the superintendent had ordered his subordinates, including Captain Eakins, to make no more reports " of alleged and reputed " houses of a disorderly character upon the ground that if there was competent evidence of their disorderly character, they should be closed, if not, they should not be reported.

Assuming that this instruction justified the captain in not making a report as to houses about which he did not have competent evidence to establish their disorderly character, it cannot be said to have warranted a positive assertion on his part, that there were no such houses in his precinct when he suspected that there were at least fifteen.

The first specification alleges neglect of duty in two other respects

namely : Not carefully observing and inspecting certain obviously disorderly places and reporting them to the superintendent or chief of police, and

Second, not earnestly and zealously proceeding to suppress and restrain disorderly conduct and practices therein and arrest the persons guilty of it.

The first step on the part of the prosecution was to prove the existence of a number of houses of prostitution or assignation within the fifteenth precinct. As already remarked, evidence was offered tending in that direction covering twenty-six houses. A brief synopsis of the evidence as to one of the houses only will be given. Of 204 Thompson street, a house without a license, and of which one McAleer was the proprietor, the witness Dennett testified that on January first he entered the place with a lady at two or three o'clock in the morning and found sixteen to twenty dissolute women huddled about and drinking with half a dozen men ; the women were constantly going in and out and up stairs to the rooms above; that he went up stairs with the lady and paid twenty-five cents for a room to which he was assigned and which he occupied, and saw and heard most disgusting evidence of vice ; that the place was entirely open to the street and without the slightest obstruction. One Whitney testified that he entered the same place on February ninth at eleven P. M. and found it filled with depraved women and people lying around drinking ; that he was solicited to go up stairs with the women, and went, paying for a room ; that four couples were ahead of him on the stairs, where he had to wait, and there were couples behind him waiting their turn. Van Ryn testified that he was with Whitney and observed the same circumstances ; that he was solicited and went up stairs and paid twenty-five cents for his room, which he entered with a woman who had solicited him ; that when he went up stairs there were four couples ahead of him, and that he had to wait on the stairs for his turn. The woman in charge of the rooms endeavored to hurry them up; this was at twelve o'clock. Van Ryn and Whitney, who were agents for the Society for the Prevention of Crime, both testified that there was no food to be seen and drinks were openly served at the bar, and that the place had all the appurtenances of a house of ill-fame, and that it was free of access from the street.

Henry Burr testified that he entered the same place on May tenth with a woman who had solicited him on Bleecker street; that they had drinks in the place and went up stairs, paying the woman in charge of the rooms twenty-five cents; that the girl exposed herself in the customary way. Van Ryn testified that he saw Burr enter the place and saw dissolute men and women going in and out, and women sitting about the place; he corroborated the testimony of Burr. McAleer was not called as a witness, nor did any one connected with the place testify as to its character.

Some citizens and officers were called by the relator who testified that they had not observed any disorder about it, while on the other hand, certain officers testified that it was a resort of "bums" and "bats" and other species of male and female prostitutes. There was more evidence as to some of the houses, and less as to others, than in the case of the Thompson street house, but it is fairly an average of the testimony as to all of the houses. An effort was made on the part of the defense to establish that some of the houses were respectable, but, notwithstanding such attempt, a finding that each and every one of the twenty-six houses were disorderly has justification in the evidence.

The agents of the Society for the Prevention of Crime were the principal witnesses, and their testimony was sufficient to establish the character of the houses. What they saw and did inside of the houses is in very many instances unchallenged.

Evidence was also introduced on the part of the prosecution to show that the streets on which these houses were situated were frequented by large numbers of prostitutes and bad characters. Testimony as to open soliciting from the stoops of some of the houses by women, who came out of and went in such houses, was given, and in some instances by residents in the vicinity. The defense in a few cases produced witnesses who were either proprietors or connected with the incriminated houses, and who attempted to establish the good character of such houses, but, in other instances, neither the proprietors or any one connected with the incriminated houses were produced. Police officers were also called, who gave evidence tending to show that the houses appeared to be all right, and citizens were found who testified that the condition of the precinct was good, and that the character of it had substantially improved since

Captain Eakins was put in charge of it.   But the most that can be said as to any one of the houses is that there was a conflict of evidence which it was the duty of the commissioners to decide.

And it must be assumed in the further consideration of this case that the commissioners found that the houses were disorderly.   This fact being found, it was still necessary, in order to charge the relator with neglect of duty, that it should appear either that he had knowledge of the existence of crime in his precinct and failed to make a reasonable effort to prevent it, or that, though he did not have such knowledge, with reasonable diligence he could have obtained evidence of criminal conduct, and failed to do so.

It is suggested that it was impossible for the captain to get evidence in the way in which the agents for the Society for the Prevention of Crime procured it; that police officers are suspected and watched by violators of the law, and, therefore, find it more difficult to procure evidence than persons against whom no suspicion attaches.   This assertion is doubtless true, and if evidence as to the character of such houses could only have been obtained in the manner in which the witnesses for the prosecution obtained it, the findings would hardly be justified.   But the question for the commissioners was not whether he could have closed them all absolutely, but whether he neglected to observe and inspect the disorderly places, and whether he, in good faith, attempted to repress, even if he could not wholly restrain, the disorderly conduct and practices therein.

The method adopted by the prosecution to substantiate the charge of neglect of duty was to show the leading facts in the history of the precinct as to its disorderly houses and persons for the period of time covered by the charges, and to give such connection as the police officers had with it.   Upon such line of investigation the prosecution conducted the examination of their witnesses, and the effort of the counsel for the defense was to present an entirely different picture of the condition of the precinct.

Having established, as we have said, the existence of twenty-six disorderly houses in a flourishing condition during the entire period covered by the charges, the next step undertaken was to show (1) that the captain had such knowledge of them as made it his duty to take aggressive action for their suppression, and (2) that they were

so openly and notoriously conducted that the captain could, with reasonable diligence, have obtained evidence of their real character, and that he omitted to do so.

Throughout this long record is to be found much evidence tending to show that dissolute women in large numbers frequented those houses openly. Witnesses who were not agents of the society have told of their experience in being accosted by women coming from, or going into, these houses.

That such women were to be found on the streets where these houses were, in large numbers, is not denied by any one. Indeed, one of the officers secured a record of 250 arrests of these unfortunates upon the streets during that period of time.

There seems to have been considerable vigilance in arresting the women upon the street, but so far as effective work was concerned it seems to have stopped at the doors of the houses, described as disorderly houses within this precinct, during the period covered by the charges.

Aside from the testimony tending to show that a great number of dissolute men and women patronized these various houses, and that their going to and from them was done in the most open manner, that the disorderly practices therein seemed to be carried on without any attempt to hide them, was properly to be considered in connection with the other facts in passing upon the question whether the captain, in the due performance of his regular duties, must necessarily have known that many of the places, at least, were disorderly houses. But in addition to the description of the houses and the conduct of the inmates, both in the houses and on the streets, there is the captain's admissions that he was suspicious, at least, of fifteen of these houses. That his suspicion had something to rest upon is not only shown by the testimony of the agents of the society, and that of citizens residing in the vicinity of these houses, but by the officers of whom he was in command. Officer Zimmerman testified that he talked with Captain Eakins about 230 Thompson street prior to the 15th day of May, 1895. This was his testimony upon that subject : " Q. 230 Thompson street; has that place been reputed to have been a disorderly house in the past ? A. Yes, sir. Q. And came within the list of suspicious places ? A. Yes, sir. Q. Did you talk about it with Captain Eakins ? A. Yes, sir. Q. Prior to the 15th day of May ? A. Yes, sir."

Similar testimony was given by Officer Zimmerman as to a number of the other houses described in the first specification, and in every one of those instances the captain admitted that the house was a suspicious house.    On the other hand, Captain Eakins described the measures taken by him to enforce the law and the ordinances of the city in his precinct.    He instructed his men to pay special attention to prostitutes loitering on the streets and soliciting.    It seemed to him desirable to send out men in citizens clothes, and at his request, during the year preceding the trial, six men were detailed from the superintendent's office, and from three to six from the inspector's office, to do the work in the precinct in citizens dress.    Thirteen patrolmen testified that they received special instructions from Captain Eakins almost daily as to the enforcement of the laws and the suppression of vice.    They detailed the special difficulties which uniformed officers experienced in attempting to suppress prostitution, and as evidence of activity in the direction of enforcement of the law it was shown that during the period covered by these charges there were 1,145 females arrested in the precinct, the ground of arrest in nearly all cases being that of soliciting.

The tendency of their testimony, and that of about thirty citizens, was to show that, while the precinct was far from being free from vice and crime, still there was generally a substantial improvement during the incumbency of Captain Eakins; an improvement due to the vigilance and effective methods of the captain, and this testimony was so effective as to persuade one of the commissioners that the general charge of neglect of duty was not made out.    Enough has been said to make it apparent that the case contained sufficient evidence to support a finding that the captain knew of the existence of disorderly places in his precinct.

Whether the captain did what he could to inspect these disorderly places, and to repress and restrain disorderly conduct and practices therein, presented another question upon which the commissioners necessarily had to pass.    What he did was certainly not effective so far as the houses described in the first specification are concerned. And the inquiry was, did he take such reasonable measures as were within his reach?    While it is true that section 285 of the Consolidation Act does not impose upon police officers the absolute duty of

applying for a superintendent's warrant to permit an entry upon suspected premises, nevertheless it authorizes the officer to make such application. This he did not do, although charged with the duty of attempting to repress and restrain disorderly conduct and practices in the houses. He, therefore, failed to take advantage of one of the means which the law afforded him to repress and restrain them. That fact was a pertinent one, which the commissioners had the right to take into consideration, with all the other surrounding facts and circumstances, in determining whether the officer was neglectful of his duty in failing to repress and restrain disorderly conduct and practices by the frequenters of houses of bad repute.

Between December 6, 1893, and January 1, 1895, fifty-seven houses were raided, while during the four months and a half covered by these charges only two houses were raided. These facts, considered in connection with the existence of twenty-six disorderly houses within the precinct, constituted another element which the commissioners were authorized to take into consideration in passing upon the general question whether the officer had been neglectful of his duty. It is said that other officers might have been as well selected for such a trial as Captain Eakins; that his record was not different from many others, and the intimation is made that he was selected for prosecution from other motives than the good of the service. If there is any justification for this assertion it is certainly not to be found in the record. We are concerned only in inquiring whether the evidence presented was of such a character as to authorize the commissioners to find, as a matter of fact, that the relator neglected to perform the duties which were devolved upon him under the statutes and the rules of the board of commissioners of police.

Our examination of the record satisfies us that there was evidence from which the commissioners were permitted to make such inferences of fact, and with that finding this court is not at liberty to interfere.

It is urged that error was committed in permitting one Highby to testify that some time in the fall previous to the period covered by these charges he saw "fornication in two or three rooms right along." This evidence was received in the first place without objection, but was subsequently stricken out on motion of the counsel for

the accused, upon the ground that it was not within the period covered by the specifications. Subsequently, on cross-examination by the relator's counsel, the witness testified that he had not seen anything of the kind in the house after January first, and that in the meantime shades had been put up so that he could not look in. Then the counsel for the prosecution insisted that the door had been so far opened on the cross-examination as to authorize him now to ask the witness what he had seen before the shades were put up; and the evidence was admitted. It is, perhaps, a close question whether the inquiries on cross-examination were of such a character as to render this evidence admissible; but the question is so near the border line as to make it the duty of the court, if it be necessary, to invoke the rule which found expression in the opinion of Presiding Justice VAN BRUNT, in the *Matter of Cross* (85 Hun, 347), that " in proceedings before the board of police entirely strict and accurate rulings in regard to questions of evidence are not always to be expected." In any event a reversal should not be had on account of the admission of this testimony, because the character of the house was abundantly proved by other evidence.

It is further urged that injury was done the relator because he was unable to obtain the true name of a witness calling herself Gertie Long; and he relies on the decision of this court in the *Matter of Cross (supra)* in support of such contention. But the point is not well taken, *first*, because the court did not rule, as in the *Cross* case, that the witness need not answer; and, therefore, the relator is without any exception to present the question; and, in the *second* place, were the question presented by proper objection and exception, it would not come within the principle of the case cited. There the woman who sought to give herself standing as a witness, because she had ceased to be a prostitute and had reformed, was permitted to withhold her name and address. This was held to be error, because the party accused had the right to investigate the present surroundings and conduct of the witness for the purpose of ascertaining whether she was entitled to the additional credit which she claimed by reason of her reformation. The witness, Gertie Long, made no such pretensions. She simply asked that she be not compelled to give her real name as a shield to her relatives.

Three witnesses, McFadden, Dr. Wetmore and Blatz, gave testi-

mony as to the general reputation of the houses known as Nos. 60, 64 and 69 West Tenth street. It is insisted that this testimony was not proper, and the case of *The People* v. *Mauch* (24 How. Pr. 276) is cited in support of this position. But that case is not in point. It was there held that evidence of the general reputation of a house is not sufficient to support a conviction for keeping a disorderly house. In the present case sufficient evidence was given to show that each one of these houses was a disorderly house outside of the testimony of the witnesses as to its general reputation. This evidence was proper for consideration upon the general question whether the relator, by a reasonably diligent prosecution of his duties as captain of the precinct, should have come to know of the character and reputation of these houses. It constituted one element which the commissioners had a right to take into consideration in connection with other facts bearing upon that question.

It is said that the testimony of these witnesses should not have been received because they made inquiry for the purpose of making themselves competent to testify as to the general reputation of the houses, and that too at a time subsequent to the period covered by the specifications. The latter assertion is wholly erroneous, as the speech of people upon which the witnesses founded their knowledge of general reputation occurred during the period covered by the charges and not subsequent thereto. The other suggestion, that the witnesses went into the district for the purpose of qualifying themselves, is incorrect so far as Dr. Wetmore and Blatz are concerned. Dr. Wetmore was a physician in the district, residing and practicing there, and had been for two years prior to the hearing. Blatz was in business in the district and had lived there for more than ten years. The witness McFadden did go into the district for the purpose of getting information about it; and if an exception had been taken to his testimony as to the general reputation of the houses, the question suggested would have been presented for consideration. As it is, it is not before us.

The writ of certiorari should be dismissed, with fifty dollars costs and printing disbursements.

Van Brunt, P. J., Rumsey, Williams and Patterson, JJ., concurred.

Writ dismissed, with fifty dollars costs and disbursements.